UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
RICHARD P. KLEINKNECHT and SUZANNE W.
KLEINKNECHT,

|  |  |
|---|---|
| *Plaintiffs*, | Case No. 19-CV-5760 |
| -against- | **COMPLAINT** |
| JOHN RITTER, JAMES SIINO, GILBERT HENOCH, GARY KALBAUGH, GREGORY LINAKIS, DAVID WENTER, CHRISTOPHER CAGNAZZI, JACK MULDERRIG, AMELIA BROGAN, MICHAEL KOLODNER, THE INCORPORATED VILLAGE OF LLOYD HARBOR, THE ZONING BOARD OF APPEALS FOR THE INCORPORATED VILLAGE OF LLOYD HARBOR, and THE PLANNING BOARD OF THE INCORPORATED VILLAGE OF LLOYD HARBOR, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

------------------------------------------------------------------------X

Richard P. Kleinknecht and Suzanne W. Kleinknecht (the "Plaintiffs"), by and through

their attorneys, Lynn Gartner Dunne, LLP, as and for their Complaint against defendants allege

upon information and belief as follows:

**The Parties**

1.      Plaintiffs, Richard P. Kleinknecht and Suzanne W. Kleinknecht, reside at and are

the owners of the real property known as 28 Plover Lane, Lloyd Harbor, County of Suffolk, State

of New York (the "Subject Property").

2.      The Subject Property is located within the Incorporated Village of Lloyd Harbor

(the "Village").

3.      The individual defendants are or were at the times pertinent to this action the Town

Attorney for the Incorporated Village of Lloyd Harbor (the "Town Attorney"); the Building

Inspector for the Incorporated Village of Lloyd Harbor (the "Building Inspector"), and those taking

adverse action against the plaintiffs under guise of their positions as member of the Zoning Board of Appeals for the Incorporated Village of Lloyd Harbor (the "ZBA"); and the members of the Planning Board of the Incorporated Village of Lloyd Harbor (the "Planning Board").

4.    The entity defendants are the Village, the ZBA, and the Planning Board.

### Jurisdiction and venue

5.    This Court has federal matter jurisdiction pursuant to 28 USC §1331 because the matter concerns a claim for damages premised upon a violation of the plaintiffs' rights under 42 U.S.C. §1983, the Bill of Rights of the United States Constitution, and specifically the "takings" clause of the Fifth Amendment of the United States Constitution, as made applicable to the states and subdivisions thereof under the Fourteenth Amendment.

6.    Venue in the Eastern District of New York is appropriate under 28 USC §1391 as the actions giving rise to the claims herein occurred in this judicial district, and the defendants took actions in New York that caused damage to the plaintiffs who reside in this judicial district, and which actions relate to real property located in this judicial district.

### Legal summary

7.    In *Knick v. Township of Scott, Pennsylvania*, __ U.S. __, 2019 WL 2552486 (June 21, 2019), the Supreme Court of the United States, determined that the passage of a local ordinance requiring that all cemeteries be kept open and accessible to the public during daylight hours, constituted a taking of the property of the owner of land containing a small family cemetery, and that an action for compensation for violation of the "takings" clause of the Fifth Amendment, under 42 U.S.C. §1983, could be brought immediately in federal court, overruling prior authority which had required state court litigation for compensation as a predicate to a federal action.

8.      The Subject Property fronts on Lloyd Harbor, in Nassau County.  The defendants have, through a series of coordinated actions taken over the course of almost a decade, knowingly and willfully deprived the plaintiffs of the ability to construct a floating dock extending from the Subject Property, and have thereby taken the plaintiffs' property in violation of the "takings clause" of the Fifth Amendment of the United States Constitution, as made applicable to the defendants by the Fourteenth Amendment, and by 42 U.S.C. §1983.

9.      The defendants' knowing and willful obstruction of the plaintiffs' exercise of their property right has constituted and continues to constitute a "taking" in violation of the Fifth Amendment of the United States Constitution, thus entitling the plaintiffs to declaratory and injunctive relief, and to compensation for the taking of this property right.

10.      The individual defendants have taken their actions to deprive the plaintiffs of their constitutional rights despite knowing that there was no reasonable objective basis for depriving the plaintiffs of their constitutional rights, and/or with malice towards the plaintiffs.

**<u>Factual summary</u>**

11.      The plaintiffs are a couple in their eighties, who have been residents of the Village for many decades, and have no knowledge as to who they may have offended, or how, to prompt the defendants to, under color of law, undertake a concerted effort to strip them of a right enjoyed by virtually every similarly situated property owner in the Village.

12.      The building of a dock is a permitted use within the Village.

13.      The Subject Property was made subject to a prohibition against what would otherwise be the right to build a dock (the "open space easement").

14.      The open space easement was the *quid pro quo* for the grant to the Subject Property of the right of its owners to utilize a public, community dock and boathouse to be erected on a

nearby parcel, thus providing the Subject Property with the equivalent of what was being taken via the open space easement.

15.     The Village and its agents thereafter released a real estate developer who had come into possession of the nearby parcel from the obligation to provide the plaintiffs with the compensation the Village had contracted to provide in return for having taken the plaintiffs' valuable property interest via the open space easement (*i.e.*, alternative means to access and utilize the waterway).

16.     The Village and its agents then – for more than a decade (and continuing to date) – refused to return to the plaintiffs the valuable property interest which had been taken *(i.e.,* the right to build a dock), despite the fact that there have already been judicial trial and appellate determinations that the Village's gift to the developer of the compensation owed to the plaintiffs – alternative access to a dock to the waterway -- voided the open space easement, and automatically restored to the plaintiffs the rights the Village had purported to "purchase" for what turned out to be illusory compensation.

17.     The subject matter of the instant action was the subject of a series of litigations in the New York State courts known as (1)  *Kleinknecht I (Kleinknecht v. Henoch,* Supreme Court, Nassau Co.[Index No. 8945/2012] [Adams, J.]); (2) *Kleinknecht II (Kleinknecht v. Brogan*, 165 A.D.3d 934 [2d Dep't 2018]); and  (3) *Kleinknecht III (Kleinknecht v. Siino*, 165 A.D.3d 936 [2d Dep't 2018], *mot. for lv. to app. den'd*, 2019 WL 2626400 [2019]).

18.     The lengths to which the Village and its agents will go is illustrated by their combination of open defiance, and use of a carefully orchestrated subterfuge, to nullify the most recent court orders, issued in *Kleinknecht III*.

19.    In a January 9, 2017 Short Form Order and Judgment, Nassau Supreme Court Justice Daniel Palmieri held:

> The petition for an order and judgment pursuant to CPLR Article 78 compelling the respondent to issue a permit for the construction of a dock on the petitioners' property is granted.  The respondent's motion to dismiss is denied.  Respondent James Siino, as Building Inspector of the Incorporated Village of Lloyd Harbor, shall issue a permit to the petitioners for construction of a dock under the application previously filed with him within 10 days of service upon him and his attorney of a copy of this Decision, Order and Judgment with notice of entry thereof, and upon his failure to do so the application shall be deemed approved as submitted and the petitioners may commence construction.
>
> \* \* \* \*
>
> [R]espondent has not asserted that petitioners' application to build the proposed dock is out of compliance with any of the requirements set forth in the Villages' Zoning Code for COD-1, and certainly has come forward with no evidence to that effect.  Petitioners' claim that their application is in order, complies with the Code, and requires no variances is therefore unrefuted, and the Court will not allow the respondent to now make a referral to the Site and Building Permit Review Board.  Given his silence on the stated compliance with all requirements necessary for issuance of the permit, such a referral would be frivolous, an obvious attempt to reset administrative review when no substantive reason has been presented to the Court. Therefore, since the 21 day period has passed, there is no basis for respondent not to issue the permit.  He will therefore be ordered to issue it.

20.    The Village appealed from Justice Palmieri's order, thus giving rise to the automatic stay of enforcement pending appeal afforded to all governmental entities by New York CPLR §5519(a)(1).

21.     The Appellate Division, in an October 19, 2018 Decision & Order, affirmed Justice Palmieri, with a modification.  Although it agreed with Justice Palmieri that since the permit application conformed "in all respects to the zoning code," the permit was required to be issued, and that a referral to the Site and Building Permit Review Board would be such a ministerial

exercise that Justice Palmieri had properly categorized it as "frivolous," and nothing more than an opportunity for further mischief by wrongdoers at the Village, the Appellate Division determined that the referral was nevertheless required by the strict letter of the statutory framework.

22.    The Appellate Division held, *inter alia*:

> There is no dispute that the petitioners' application giving rise to this proceeding conforms in all respects to the zoning code. The Building Inspector therefore had a nondiscretionary legal duty to refer the petitioners' application to the Site and Building Permit Review Board within 21 days (see Village of Lloyd Harbor Code § 205-33[A]). The petitioners demonstrated that the Building Inspector refused to do so. The petitioners therefore established a clear legal right to compel the Building Inspector to comply with the Village of Lloyd Harbor Code § 205-33(A).

> * * * *

> Nevertheless, the Supreme Court should not have, at this juncture, issued a judgment directing the Building Inspector to grant the permit. The Village of Lloyd Harbor Code . . . requires that the Building Inspector "refer" an application "to the Site and Building Permit Review Board . . . . within 21 days of the date that the completed application is received by the Building Inspector (Village of Lloyd Harbor Code § 205-33[A]). . . . . The Building Inspector may issue a building permit only upon approval by the Site and Building Permit Review Board. . . Here, the court's directive to the Building Inspector bypassed these provisions of the Village Code and, thus, exceeded the relief to which the petitioners were entitled.

> * * * *

> Accordingly, we modify the order and judgment by directing the Building Inspector to forward the petitioners' permit application to the Village's Site and Building Permit Review Board in accordance with Village of Lloyd Harbor Code § 205-33(A).

23.    The defendants, by moving in the Appellate Division for reargument or leave to appeal to the Court of Appeals, and then in the Court of Appeals for leave to appeal, prolonged the statutory automatic stay of enforcement.

24.    However, upon the denial of both motions – and in particular upon the June 27, 2019 denial by the Court of Appeals of the defendants' motion for leave to appeal to the Court of Appeals – the stay expired.

25.    Despite this, and despite months having passed since that time, the plaintiffs have not been informed of what disposition has been made of their permit application.  Has Building Inspector Siino forwarded the application to the Site and Building Permit Review Board?  Has he received approval from the Site and Building Permit Review Board to issue the permit?  None of this has been revealed to the plaintiffs.

26.    What the plaintiffs **have** learned is that the defendants – and in particular Siino and Village Attorney Ritter -- have undertaken by other means to deprive the plaintiffs of their right to the dock.

27.    A dock requires permits not simply from the Village (a "Village permit"), but from the New York State Department of Environmental Conservation ("DEC") (a "DEC permit"), from U.S. Army Corps of Engineers/NY District (an "Army Corps permit"), and from the New York State Department of State, Office of Planning and Development, Coastal Resources (a "DOS permit").

28.    Each of the four reviewing entities – the Village, the DEC, the DOS, and the Army Corps – have always conducted their own independent reviews of the unique regulations under their separate jurisdictions.

29.    In the past, as demonstrated more fully below, the DEC and the Army Corps have issued permits to the plaintiffs for the earlier proposals for a dock, even when those proposals would have required a variance from the Village zoning requirements, and where a needed Village permit was denied.  *See, Kleinknecht II.*

30.     The plaintiffs submitted to the U.S. Army Corps of Engineers/NY District, an application for a permit for the dock whose Village permit was the subject of *Kleinknecht III.*

31.     By Letter of Permission dated September 26, 2019, the Army Corp gave its approval for the dock, but conditional on DOS approval.

32.     In *Kleinknecht III* (*see,* ¶¶19-22, *supra*), the Appellate Division affirmed Justice Palmieri's determination that the Village had not refuted, via evidentiary submission, that the proposed dock was in compliance with all requirements set forth in the Village zoning code for COD-1, had not even argued to the contrary, and the Appellate Division affirmatively determined that the proposed dock "conforms in all respects to the zoning code."

33.     The plaintiffs have been informed that the Village Attorney and the Building Inspector nevertheless interceded in the DOS permit process.

34.     The Village Attorney and the Building Inspector conducted *sub rosa* communications with DOS.

35.     In these secret communications, the Village Attorney and the Building Inspector for the very first time asserted objections that the dock was ***not*** in compliance.

36.     The Village Attorney and the Building Inspector insisted that because a permit should not issue which would be "inconsistent" with Village regulations, the DOS must refuse to give the dock approval, thus preventing the issuance of the DOS permit, and preventing the conditional Army Corps Letter of Permission from taking effect.

37.     By letter dated September 20, 2019, and additional telephonic communications, DOS informed the plaintiffs that based upon Village Attorney Siino's and Village Attorney Ritter's intercession, the application was denied as "inconsistent" with the Village Code, and that the

plaintiffs were required to "provide an alternative to the proposed floating dock structure," which might be approved if the defendants in their sole discretion deemed it acceptable.

38.     The Village Attorney and the Building Inspector took these actions with full knowledge that when the issue was being actually litigated in court, and they were given a full and fair opportunity to do so, they did not contest the compliance of the plaintiffs' application with all Village regulations, and that the issue was thus adjudicated by both Justice Palmieri, and the Appellate Division, in the decisions quoted above at ¶¶19-22, *supra*.

39.     The Village Attorney and the Building Inspector took these actions for no purpose other than to in bad faith continue and extend their taking of the plaintiffs' valuable property rights.

**The State Court litigation**

40.     The open space easement was derived from a 1990 Indenture.

41.     The prohibition embodied by the open space easement was the *quid pro quo* for the plaintiffs' property being given access by the Village to a public boathouse and dock.

42.     But the Village later permitted a developer to shut off that access, defeating and eliminating the consideration for the *quid pro quo*.

43.     In *Kleinknecht I*, the Supreme Court, Nassau County (Adams, J.), declared null and void the open space easement.

44.     Justice Adams, by Judgment dated November 20, 2013, in *Kleinknecht I*, overturned a refusal by the Planning Board, in purported reliance on the open space easement, to even ***consider*** the plaintiffs' application for a permit for construction of a dock.

45.     As subsequently held by the Appellate Division in *Kleinknecht III*, Justice Adams "[in *Kleinknecht I*] found the Planning Board's determination was arbitrary and capricious in light

of certain subsequent actions taken by the Village that defeated the original purpose of the open space easement [citation omitted]."  165 A.D.3d at 937.

46.    Justice Adams therefore "directed the Village to issue a permit upon the filing of an appropriate or 'required' application."

47.    The Village did not appeal.

48.    As the Appellate Division in *Kleinknecht III* elaborated, 165 A.D.3d at 939, Justice Adams, after a full and fair opportunity to litigate the issue, having ruled in *Kleinknecht I* that the open space easement was invalid, and the Village having elected not to appeal Justice Adams' determination, but instead to afford that determination finality, the Village was estopped from asserting the continuing validity of the open space easement:

> [T]he plaintiffs contend that the issue of the validity of the open space easement was decided in their favor in *Kleinknecht I*, and that the Building Inspector therefore is estopped from asserting its validity here. The plaintiffs are correct. . . . In *Kleinknecht I*, the Supreme Court considered a dispute arising from the plaintiffs' efforts to obtain a release from the Village's open space easement. In adjudicating that dispute, the court had before it all of the necessary evidence relating to the open space easement. The court directed the Village to issue a permit to the plaintiffs so that they could build a dock. Given the posture of that litigation, the court's directive, and the content of the court's decision, it is clear that the court necessarily decided the issue of whether the Village had, as against the plaintiffs, an enforceable property interest (see RPAPL 1951[1] ), and that the court decided the issue in the plaintiffs' favor. Therefore, the Building Inspector, who was in privity with the Village officials in *Kleinknecht I* [citation omitted] was estopped from asserting the validity of the open space easement in opposition to the instant CPLR article 78 petition [citations omitted].

49.    In *Kleinknecht II*, the plaintiffs submitted an application for a dock.  The application required certain variances. The Building Inspector denied the plaintiffs' application. That denial was affirmed by the ZBA. The plaintiffs commenced a proceeding seeking to overturn the denial of their variance request.

50.     The Supreme Court, in an opinion by Justice Palmieri, concluded that without even getting into the open space easement issue, the ZBA's decision to deny a variance was supported by substantial evidence.

51.     The plaintiffs appealed Justice Palmieri's decision in *Kleinknecht II*.    Justice Palmieri's decision was affirmed by the Appellate Division, specifically "for reasons independent of whether the [open space] easement was still enforceable" – *i.e.,* based solely on the variance issue.

52.     Pending their appeal of *Kleinknecht II*, though, the plaintiffs submitted an application for the construction of a dock the approval of which would not require any variances.

53.     Notwithstanding the foregoing, defendant James Siino, the Building Inspector, refused to either issue a permit, or make a referral to the Site and Building Permit Review Board.

54.     Rather, the Building Inspector referred the application to John Ritter, Jr., the Village Attorney, for a response.

55.     By letter, the Village Attorney announced that due to the open space easement which Justice Adams had adjudicated to be null and invalid, "the Building Inspector is not authorized to issue any building permits for the encumbered portion of the Kleinknecht property."

56.     Because the unenforceability of the open space easement had already been adjudicated and finally determined by Justice Adams in *Kleinknecht I*, Justice Palmieri – the same judge who ruled for the Village in *Kleinknecht II* – directed the Building Inspector to issue a permit in *Kleinknecht III*.

57.     The Village appealed Justice Palmieri's decision in *Kleinknecht III*.

58.     The Appellate Division, on appeal in *Kleinknecht III*, affirmed, modifying only to direct that the permit application had to first be forwarded to the Site and Permit Review Board before the Building Inspector could issue the permit.

59.     To date, the plaintiffs still have not received their permit.  Whatever happens on that score, however, the fact is that since the 2011 submission of the plaintiffs' initial application for permission to build the same sort of dock off the Subject Property that many other property owners in adjoining or nearby plots of land enjoy, the plaintiffs have been denied such permission under color of law by the defendants – a taking of a valuable property right, over an extended period of time.

**Detailed background to the creation and voiding of the open space easement**

60.     The Subject Property was originally part of an estate owned by the Livingston family, which was in 1967 conveyed to Friends World College ("FWC") pursuant to a covenant which restricted its use to educational purposes.

61.     Paragraph 2 of a December 7, 1990 deed to the Village from FWC conveyed to the Village "so much of the interests and rights (including riparian and littoral rights) respecting the construction of structures and the development of such areas as limited below … such that from and after the date of this Indenture":

> 2.     The Open Space Lands shall be kept in their present state for purposes of conservation, wildlife and wetlands preservation, and shall not, except as otherwise permitted herein, be developed beyond their present state. The existing boathouse and pier may remain and be maintained at their present location and may continue to be used for all lawful purposes but no new docks, piers, paving, bulkheads, roads, parking areas or construction of any sort shall be installed.

> * * * *

> 7.     At the option of the College, the existing boathouse and pier located within the Open Space Lands may be used in the

future by the members of any homeowners association which may be created in connection with any future subdivision of Parcel 12 as shown on the Map. This grant and the terms contained therein shall not be deemed to prevent improvement to or enlargement of the existing boathouse and pier subject to applicable laws and regulations in order to reasonably accommodate such possible future use or such other future use as the owner of Parcel 12 from time to time may otherwise be entitled to make of such boathouse and pier provided that such enlargement shall not add to their present size by more than 50%.

62.    The Final Hearing & Decision of the FWC subdivision application provided, in part, in Section (A)(3), that all future deeds should include open space easements:

(a)    the deeds of conveyance for each parcel along the shorefront, which deeds shall refer to the indenture previously delivered to the Village which granted to the Village all development rights (including riparian and littoral rights) in a 4.46 acre parcel of land along the shoreline. The deeds shall restate the following:

i.    That the open spaces shall be kept in its present state for purposes of conservation, wildlife and wetlands preservation and shall not, except as otherwise permitted, be developed beyond its present state. The existing boathouse and pier may be maintained at their present location and may continue to be used for lawful purposes, but no new docks, piers, paving, bulkheads or construction of any sort shall be permitted along this shorefront area.

* * * *

(c)    A declaration of covenants and restrictions requiring or creating the following:

i.    Use of the boathouse and dock shall be limited to the members of the Homeowners Association created hereunder only, and shall be used in a manner which is customary and incidental to residential use, except that:

1)    There shall be no overnight charging or tie up of boats at the dock, except dinghies or other similar small crafts.

13

2)    No jet skis or personal water crafts shall be launched or operated from the dock.

3)    There shall be no storage of gasoline, motor oil or other flammable substances at the boathouse or dock area.

4)    There shall be no winter storage of boats on the boat house premises.

5)    There shall be no commercial use or renting of the boathouse at any time.

6)    There shall be no kitchen or sleeping facilities in the boathouse.

7)    No construction, alterations or improvements shall be made to the existing boathouse and dock without prior approval by the Village's Environmental Review Board, and any other boards or governmental agency having jurisdiction over the premises.

63.    FWC ultimately failed economically.

64.    FWC filed for bankruptcy.

65.    As part of its bankruptcy filing, the covenant which restricted the use of the estate property to educational purposes was terminated.

66.    In seeking to liquidate its assets for the benefit of its creditors, FWC filed a subdivision map consisting of a number of 2-acre building plots designed for the erection of one-family residences, along a street known as Fox Meadow.

67.    The subdivision map was approved in or about December 7, 1993, by the Planning Board.

68.    The minutes of the hearing conducted on December 7, 1993 by the Planning Board with respect to Section 2 of the map of FWC, reflect that as a *quid pro quo* for the provision of access to the Harbor by reason of a pre-existing boathouse and dock, the Village, by way the open

space easement, would take the development rights along the bank of the Harbor from the homes fronting on the Harbor, including the Subject Property.

69.    Shortly after the approval of the FWC subdivision map on December 7, 1993, the former FWC property was conveyed to Dillon Development Corp. (hereinafter "Dillon").

70.    Dillon, in or about April 1998, filed an application with the Planning Board seeking to modify the restrictive covenants so that the subsequent fee owners of the ten lots shown on the subdivision would not have a vested right to use the boathouse and dock, but that their rights would be at the sufferance of the principal of Dillon, who would own, and have the right to permit or exclude any other homeowners from the use of the dock.

71.    In plain English, the consideration for the Village's taking from the homes fronting on the Harbor (including the Subject Property), of the development rights along the bank of the Harbor, via the open space easement, was itself being proposed to be taken, and conveyed gratis, to a completely separate private party, *i.e.,* Dillon's principal.

72.    At the hearing on April 6, 1998, it was clear to the Planning Board that an approval of the Dillon application would result in the municipality "taking," and gifting to Dillon, the consideration the waterfront parcels, including the Subject Property, were to receive in return for the open space easement.

73.    The Planning Board acknowledged that this posed liability concerns for the Village vis-a-vis the adversely affected waterfront owners (such as the instant plaintiffs).

74.    The Planning Board chairman, Gilbert Henoch, stated:

MR. HENOCH:    I think it opens up a whole can of worms. I can see us being sued by each one of those people. I think they can argue, once they lose the right to use that boathouse, they don't have access to the water.

(Transcript of Hearing p. 18)

\* \* \* \*

> MR. HENOCH:    Because the trade of that right of way and the homeowners in exchange, as [Planning Board member] Dud[ley Keyes] said, we are taking away the right of access to the waterfront across all those lots. They lose the enjoyment and they still have a restriction.

(Transcript of Hearing p. 19)

75.    The Village Attorney, John Ritter, Jr., who was a participant in all of the hearings before the Planning Board with respect to the processing and ultimate approval of Section 2 of the FWC subdivision map, stated:

> MR. RITTER:    What troubles me, from a legal perspective, is the quid pro quo for extinguishing the rights to the waterfront property which extends into the dock parcel, is that grounds for extinguishing covenants and restrictions and any indenture that's been placed toward these properties is a change of circumstances?

(Transcript of Hearing p. 15)

76.    The Dillon application was denied by the Planning Board on or about July 8, 1998.

77.    Within several months thereafter, though, Dillon filed another application seeking to again modify the FWC subdivision map.

78.    The second Dillon application sought to merge the lot containing the residence of Dillon's principal with the lot containing the boathouse and dock, and extinguish the provision that the boathouse and dock were a community asset owned and to be used by all of the homeowners in the subdivision.

79.    A public hearing was held on the second Dillon application on September 10, 1998.

80.    The Planning Board was again represented by Mr. Ritter, who spoke on behalf of the Planning Board in analyzing the application. At that hearing, Mr. Ritter acknowledged that the same concerns which had led to the denial of the first Dillon application, on July 8, 1988, still remained:

> MR. RITTER:    I think if I would be the advocate for that lawsuit, I certainly would bring in the fact that my riparian rights have been taken away during the subdivision process in trade for community use of a dock, and now that has been further reduced.

 (Transcript of Hearing p. 57)

81.    No reason to justify the change in the FWS subdivision map was given by the applicant Dillon.

82.    No allegation was made by the applicant that there had been a material change in circumstances since the date of filing of approval of the FWC subdivision map, and the filing thereof.

83.    The Village attorney, Mr. Ritter, did not advise the Planning Board that the applicant needed to show a material change of circumstances to modify the filed FWC subdivision map.

84.    This second Dillon application was approved by resolution dated September 10, 1998.

85.    New York State Village Law, Section 7-728(11) states that an approved final plat plan must be filed within 62 days of the grant of each application.

86.    Dillon failed to file by November 12, 1998. Consequently, the approval lapsed.

87.    The plaintiffs took title to the Subject Property on January 13, 1999.

88.    The deed by which Dillon transmitted the Subject Property to the plaintiffs contradicted itself.  One the one hand, the deed provided (emphasis added):

> **The existing boathouse and pier** may be maintained at their present location and **may continue to be used for lawful purposes**, but no new docks, piers, paving, bulkheads or construction of any sort shall be permitted along this shorefront area.

The deed on the on the other hand said (emphasis added):

> **Use of the boathouse, dock, and boathouse area** as depicted on the filed subdivision map **is not included in this conveyance.**

89.     On March 22, 2001, Dillon filed a final map to complete the second Dillon application, notwithstanding the lapse of that application two and a half years earlier, pursuant to Village Law, Section 7-728(11).

90.     The Village did not object to Dillon's legally invalid filing.

91.     As a result of the completion of the second Dillon application, the plaintiffs remained, at least of record, subject to a covenant which restricted them from building a dock (the open space easement), notwithstanding the fact that the boathouse and dock which were supposed to give them access to the water, and act as compensation for the open space easement, had been of record taken by the Village and gifted to Dillon.

92.     The nearest residence abutting the Subject Property on the west – that of Dillon -- now has the benefit of a boathouse and dock.

93.     The nearest residence to the east of the Subject Property also has a dock.

94.     Plaintiffs have no dock, and have not been permitted by the defendants to construct one, notwithstanding that such construction is a permitted use within the Village.

95.     The Subject Property has been substantially devalued.

## The defendants' bad faith obstructionism in the initial approval process

96.    In 2011, the plaintiffs filed an application with the Planning Board to permit a floating dock, which conforms to Code, for the boating season only, and then plaintiffs would remove it and store it for the winter.

97.    The plaintiffs also filed an application with the Planning Board, seeking to modify the covenants insofar as the same might be contended to still prohibit the erection of a dock at their property.

98.    On information and belief, the defendants immediately came to an agreement and understanding among themselves, explicit or implicit, that in order to effect the taking by the Village of the plaintiffs' right to build a dock by what effectively amounted to an informal (and uncompensated) use of the power of eminent domain, they would utilize their governmental Village positions and governmental Village resources to wear out the plaintiffs by placing every possible obstruction and delay in their path, and forcing them to litigate in multiple courts at multiple levels, over what they knew and planned would be period of many years.

99.    The plaintiffs' application came on to be heard in July 2011 at a public hearing, which upon information and belief, was duly noticed.

100.    At that time, the defendants all knew and recognized that a dock was a permitted use within the Village, to which there was therefore no legitimate objection; and knew and recognized that the basis for the open space easement no longer existed, since the community dock and boathouse which were to have provided alternative access for the plaintiffs had been gifted away by the defendants.

101.    At the conclusion of the presentation of plaintiffs' application by their then counsel, James Margolin, Esq., the Chairman, after exchanging thoughts with Mr. Ritter, announced that the record would remain open.

102.    On or about August 22, 2011, plaintiffs' substitute counsel, Robert P. Lynn, Jr., sent a letter to the Planning Board setting forth that he had just been retained and that the continued hearing (at that time scheduled for September 8), needed to be adjourned until October 13.

103.    The Planning Board agreed, and published legal notices for a continued hearing.

104.    The first such published legal notice was set forth in *The Long Islander*, in its edition on September 29, 2011, and such notice stated as follows:

### VILLAGE OF LLOYD HARBOR
### PLANNING BOARD

### PUBLIC NOTICE

A public hearing and meeting will be held before and by the Planning Board of the Incorporated Village Lloyd Harbor, Suffolk County, New York, at the Village Hall at 32 Middle Hollow Road in said Village, on Thursday, October 13, 2011 at 7:30 p.m.

The hearing will be on the application of Suzanne and Richard Kleinknecht, owners of a parcel of land located at 28 Plover Lane in the Village, designated on the Real Property Tax Map of Suffolk County as District 0403, Section 10, Block 02, Lot 12.009. The Applicants seek to amend paragraph A(3)(a)(I) of the final Planning Board decision for Friends World College Section 3 to permit the construction of a floating dock system at the premises, which construction is currently prohibited by the above referenced section of the final decision.

The above application is on file at the Village Hall where they may be seen from 9 a.m. to 4 p.m. during usual business days until the time of the hearing.

All interested persons will be given an opportunity to be heard at said time and place. If any individual requires special assistance to attend, please notify the Village Clerk at least 48 hours in advance of the hearing.

P-2011-04
Gilbert Henoch, Chairman
September 29, 2011
9-29-1T-26931

105.    Subsequent thereto, the Village published another notice of the public hearing in

*The Long Islander* on October 27, 2011, and such notice stated as follows:

### VILLAGE OF LLOYD HARBOR
### PLANNING BOARD
### PUBLIC NOTICE

A public hearing and meeting will be held before and by the Planning Board of the Incorporated Village Lloyd Harbor, Suffolk County, New York, at the Village Hall at 32 Middle Hollow Road in said Village, on Thursday, November 10, 2011 at 7:30 p.m.

The hearing will be on the application of Suzanne and Richard Kleinknecht, owners of a parcel of land located at 28 Plover Lane in the Village, designated on the Real Property Tax Map of Suffolk County as District 0403, Section 10, Block 02, Lot 12.009. The Applicants seek to amend paragraph A(3)(a)(I) of the final Planning Board decision for Friends World College Section 3 to permit the construction of a floating dock system at the premises, which construction is currently prohibited by the above referenced section of the final decision.

The above application is on file at the Village Hall where they may be seen from 9 a.m. to 4 p.m. during usual business days until the time of the hearing.

All interested persons will be given an opportunity to be heard at said time and place. If any individual requires special assistance to attend, please notify the Village Clerk at least 48 hours in advance of the hearing.

P-2011-04
Gilbert Henoch, Chairman
October 27, 2011
10-27-1T-270101

106.    Subsequent to the publication of those two notices, the hearing was again adjourned, and ultimately came on to be heard on the February 9, 2012.

107.    In anticipation of the hearing, plaintiffs' counsel communicated numerous times with the Village.

108.    In furtherance of plaintiffs' communications, the plaintiffs were charged and paid a $500 fee, purportedly for the cost of republication of the legal notices, all as set forth in a letter from plaintiffs' counsel to the Village Clerk.

109.    In the interest of apprising the Planning Board of the issues intended to be raised at the continued hearing pursuant to the aforesaid legal notices, on September 29, 2011 and October 27, 2011, plaintiffs' counsel communicated with Mr. Ritter, and provided him with plaintiffs' memorandum of facts and law.

110.    Prior to the hearing set for February 9, 2012, plaintiffs' counsel wrote the Village Clerk, Gail Devol, and provided her with documents which were part of plaintiffs' presentation to be made to the Planning Board.

111.    On February 8, 2012, plaintiffs' counsel filed with the Village an affidavit of Matthew Smith of Standard Valuation Services, which was intended to be his direct testimony. Such affidavit was accompanied by a letter indicating that Mr. Smith would be present at the hearing, and available to respond to questions from the Planning Board.

112.    Plaintiffs' counsel also filed, by letter dated January 6, 2012, its memorandum of facts and law with the Village Clerk and asked that it be made part of the record and distributed to members of the Board. This letter also transmitted the neighbors' consent.

113.    Plaintiffs caused all of the materials, documents and expert reports available to them prior to the night of the hearing scheduled for February 9, 2012 to be delivered to the Village Clerk, Gail Devol, for distribution to the members of the Planning Board in advance of the hearing.

114.    The members of the Planning Board knew that the plaintiffs were prepared to proceed with the hearing for which they had paid the $500 fee.

115.    At or about the appointed time, the plaintiffs and their counsel appeared at Village Hall for the commencement of the hearing at 8:30 in the evening.

116.    Attending with plaintiffs were Cole Hayes, plaintiffs' landscape architect and designer of its proposed dock; Matthew Smith, a member of the American Institute of Appraisers, who was prepared to respond to questions and for whom plaintiffs had previously caused his expert report to be delivered to the Village for distribution to the members of the Planning Board; Aram Terchunian, of First Coastal Corporation, plaintiffs' environmental expert, who was prepared to testify as to the lack of significance of any environmental impact.  Mr. Terchunian's expert report was also provided to the Village for distribution to the members of the Planning Board in advance of the hearing.

117.    When plaintiff appeared, the Village Clerk, Gail Devol, indicated that the Village attorney, Mr. Ritter, would not be attending, and that the Village had not arranged for a stenographer.

118.    Accordingly, plaintiffs' counsel requested that Ms. Devol mark as exhibits various documents including plaintiffs' memorandum of law and facts; the expert report of Matthew Smith; the expert report of Aram Terchunian; and various documents obtained by plaintiffs from the Planning Board files with respect to prior applications effecting the FWC, Section 2 subdivision map, all of which documents were referred to in plaintiffs' memorandum of law and facts.

119.    In due course, the Planning Board chairman, Gilbert Henoch appeared. Also attending on behalf of the Board was Richard Ambrosio, and Gary Kalbaugh, and Gregory Linakis.

120.    The chairman of the Planning Board, Mr. Henoch, spoke, advising plaintiffs and their counsel that no public hearing was to be held that evening; that the hearing had been secretly closed seven months earlier, in July 2011, at the initial appearance of the plaintiffs' prior counsel, Mr. Margolin; and that nothing further would be entertained.

121.    The chairman announced this unilaterally, and notwithstanding the fact that legal notices had been run for several months subsequent thereto, noticing hearings at which all interested parties could be heard as cited above, an adjournment/re-advertisement fee of $500.00 was charged plaintiffs, and that there had been correspondence and interaction between the Planning Board and plaintiffs' new counsel about the adjourned hearing date and what was expected to occur on that occasion.

122.    The chairman refused to permit plaintiffs' counsel to present any witnesses and refused to permit counsel to provide additional copies to the members of the Planning Board of the documents previously delivered to the Village Clerk for distribution to the members of the Planning Board.

123.    The chairman did permit counsel for plaintiffs to speak, but no minutes or record was kept.

124.    Notwithstanding the advice earlier that evening from Ms. Devol that the Village attorney, Mr. Ritter, would not be present, Mr. Ritter appeared and spoke from time to time, expressing opinions and responding to questions from the Planning Board.

125.    At one point in time the chairman indicated that he wished to take a recess so he could consult with counsel.

126.    Mr. Ritter, and the four members of the Planning Board present, retired to an adjacent room.

127.    At the conclusion of these truncated proceedings, Mr. Henoch called for a vote of the Planning Board on the application which he said had been "closed" seven months earlier.

128.    The Planning Board consisted of seven members, and had a quorum of four members present.  The vote sought by Mr. Henoch was to deny plaintiffs' application.

129.    Mr. Ambrosio abstained, and Mr. Henoch and the two other members present voted no.

130.    The no vote was therefore not sufficient to carry in that it did not constitute a majority of the seven-member Planning Board.

131.    Plaintiffs' counsel asked that the hearing be reopened if in fact it was ever closed as alleged by chairman Henoch.

132.    The chair denied the request.

133.    The chair denied that there had been legal notices published by the Village.

134.    The Planning Board, on February 29, 2012, re-convened, for the sole purpose of denying the plaintiffs' application.

135.    The Planning Board members in attendance on February 29, 2012 were Chairman Henoch, Mr. Kalbaugh, Mr. Linakis and Mr. Wenger.

136.    As on February 9, 2012, on February 29, 2012, plaintiffs were denied a continued hearing, although counsel was allowed to briefly address the Planning Board without a stenographer present.

137.    The Planning Board, again, but this time with a quorum present, voted to deny the application, stating in part that to grant it would be a violation of the open space easement.

138.    The Planning Board failed to adequately set forth findings nor its reason for its denial.

139.    The findings were conclusory in nature and not supported by the record.

140.    The plaintiffs' application was based upon a material change of circumstances from the time of the imposition of the open space easement (*i.e.,* the gifting by the Planning Board to Dillon of the right which was to act as compensation for the imposition of the open space easement).

## Kleinknecht I

141.    In *Kleinknecht I*, the Short Form Order, in detailed analysis, reviewed the history of the open space easement.

142.    After this review, Justice Adams held that the open space easement was invalid.

143.    Specifically, Justice Adams held with respect to the background as follows (emphasis added):

> … In 1967 the Estate of Eleanor Livingston conveyed a 93 acre waterfront parcel in Lloyd Harbor to Friends World College for educational purposes. The parcel was improved with a number of residential buildings and a large pier or dock. In 1984, due to financial difficulties, the college obtained a partial release of the restrictive covenant which limited the property to educational purposes, and subdivided it into 18 residential building lots and a 54 acre remainder (i.e., Friends World College, Section 1). It continued to utilize the 54 waterfront acres along Lloyd Harbor for educational purposes.
>
> Approximately five years later, in 1989 the college obtained permission to subdivide the 54 acre parcel into another 10 residential building lots for sale (i.e. Friends World College, Section 2).  The remaining 28 acre waterfront parcel was retained by the school for educational purposes. Notably, as part of that proceeding the college granted the Village "an interest including riparian and littoral rights" in a 4.47 acre shoreline portion of the remainder and conditioned final approval of the residential subdivision upon its Board of Trustees' acceptable of the aforementioned indenture in exchange for allowing the school to retain the dock and forego the creation of recreational lands or the payment of a fee in lieu thereof (see Village

Law §7-730). The development rights of the waterfront were therefore transferred to the Village in order to establish a conservation area. Any future waterfront access or new dock construction, apart from the college's pre-existing structure, was prohibited.

Finally, in September 1992, the school subdivided its remaining 28 acre parcel into 10 building lots (i.e. Friends of World College, Section 3). The defendants/respondents' approval of Section 3 explicitly restricted the use of the pre-existing dock and related structure to an anticipated homeowners association consisting of the owners of those 10 parcels. Such approval was subject to multiple hearings before the Village Planning Board and as part of the Planning Board's approval, the pre-existing boathouse and dock which had belonged to the Livingston Estate was to be situated on a quarter (1/4) acre lot to be owned by the homeowners' association (the "HOA"), and to be used in common by the ten lots for purposes of water access. **In fact, the minutes of the December 7, 1993 hearing reflect that the community dock, including the right to extend that dock, was a quid pro quo for the developer conveying development rights along the waterfront lots to the village, and a covenant that the homeowners of the six waterfront lots would not have a right to develop their individual waterfront. Such a covenant would prohibit docks or piers, even though docks are permitted in the Incorporated Village of Lloyd Harbor in the Coastal Overlay District.** In 1995 the college conveyed the entire 28 acre subdivision to a non-party, Dillon Development Corporation, whose principal is or was Robert Balemian. **Mr. Balemian later sought permission to retain the dock for his personal, rather than the future homeowners' association's use.** On July 9, 1998, however, the defendants/respondents denied that application because, inter alia, the structure was not contiguous with the lots he planned to retain. Following a reconfiguration of the subdivision and a public hearing, **on September 10, 1998 the defendants/respondents granted Mr. Balemian's revised application.** The transcript of that hearing reflects that there had been no change, in fact, no evidence that was offered by the applicant, or by the Board that there had been any change of circumstances. The minutes of that hearing reflect that the Board appeared to have the same reservations, that resulted in its July 8, 1998 denial, but nevertheless, this time approved the application.

Thereafter, on December 18, 1998, new covenants and restrictions were filed, yet the prior restrictions that prohibited one from building a dock although modified by it, were not replaced. Ultimately, on January 13, 1999 Dillon Development Corporation conveyed one of the other subdivision lots (i.e. Lot 9) to the plaintiffs/petitioners.

In or around June, 2011 the plaintiffs/petitioners applied to the defendants/respondents to modify paragraph A(3)(a)(i) of the school's final conveyance (i.e. Section 3) ("[t]he existing boathouse and pier may be maintained at their present location and may continue to be used for lawful purposes, but no new docks, piers, paving, bulkheads, or construction of any sort shall be permitted along this shorefront area") in order to permit the construction of a floating dock (see defendants'/respondents' Exhibit 1, p. 5). After July 14, 2011, February 9, 2012, and February 29, 2012 public hearings, the defendants/respondents issued a resolution (see defendants/respondents' Exhibit 10) denying the plaintiffs/petitioners' application.

144.   Justice Adams then granted the plaintiffs' application holding as follows (emphasis added):

It is the Court's opinion, based upon a review of the lengthy factual history presented in this Petition with respect to this property, that the Board in approving the filing of Section 2 of the Map of Friends World College, developed a plan for a homeowners' association, which was required to be created, both with respect to road maintenance and the pre-existing boathouse. The boathouse and dock was to be situated on a non-buildable parcel ("one quarter acre") to be owned by the HOA. It is further clear that the Board in denying the first application of Dillon Development Corporation in 1993 to modify the covenants did not think it appropriate to limit access to the boathouse and dock, as then proposed, only to persons permitted to use it from time to time by Dillon Development Corporation. **It is further the finding of this Court that the modification of the restrictive covenant, and the amendment of the subdivision map on Dillon's second application in September 1998 to merge the boathouse lot into Lot 7, constitutes a substantial change in circumstances** (Matter of 1066 Land Corp. v. Planning Board of Town of Austerlitz, 218 AD2d 887 [3d Dept 1995]; Matter of Marx v. Planning Board of Village of Mill Neck, 185 AD2d 348, 349 [2d Dept 1992]). **It is this Court's**

**opinion that the change in circumstances was such that there was a complete failure of the Board's prior plan to eliminate beach access and docks for the six (6) waterfront parcels as a tradeoff for the access to the boathouse, its beach, and a large pier,** which the initial Planning Board resolution permitted to be extended and which its subsequent decision merging the lots, left unchanged. As a result of the September 1998 approval by the Board, a single lot, Lot 7, had beach rights, a boathouse, and a pier. **The decision of the Board is not based on substantial evidence, and its decision is arbitrary and capricious based upon the clear factual history of this subdivision, and the change approved with the second 1998 application.**

* * *

In conclusion, the determination of the Board, to deny the application, is arbitrary and capricious and is not based upon substantial evidence. The reasons set forth in the Board's decision do not justify its conclusion in view of the prior history cited in the Petition and the intentional deprivation of due process to the applicants, is sufficiently egregious, that **this Court does not consider that a re-hearing would be either necessary or appropriate. The Board cannot now change the facts it created by granting the September 1998 modification to the Map, and covenant, which effectively creates a change of circumstances justifying Petitioners' application and grant thereof.**

**Accordingly, the determination of the Planning Board of the Village of Lloyd Harbor is annulled, and the Petitioners shall be entitled to the issuance of a permit to erect a dock upon the filing of an appropriate application, and the payment of any fees therefor.** The defendants/respondents' motion to dismiss is granted only insofar as the declaratory judgment action having been rendered moot by this decision order and judgment, and such motion is granted as to that portion of this action.

145.    Justice Adams outlined several areas where the actions of the Planning Board were in bad faith.

146.    The Planning Board charged the plaintiffs for re-advertising an adjourned hearing on more than one occasion.

29

147.    However, the Planning Board refused to allow the plaintiffs to present evidence "at a hearing which had then been advertised three times."

148.    The Planning Board did not have a stenographer present based on its "unilateral" and secret determination not to conduct a hearing.

149.    The Court held that the Planning Board's action amounted to an "intentional deprivation of due process" which was so "egregious" that Justice Adams did not think that a re-hearing was necessary or appropriate. *Id.*, at p. 7.

150.    Justice Adams determined that the change in circumstances which the plaintiffs faced was one created by the Planning Board when it approved the September 1998 privatization to Dillon of the dock which was supposed to have provided access to those in the plaintiffs' position.

151.    Thus, Justice Adams held that the plaintiffs had a right to erect a dock and directed the Planning Board to issue a permit upon the filing of an appropriate application.

152.    The Judgment issued in *Kleinknecht I* ordered that "the determination of the Planning Board of the Village of Lloyd Harbor dated the 29th day of February, 2012 is hereby annulled."

153.    The Judgement issued in *Kleinknecht I* further ordered (with emphasis added) "that the Incorporated Village of Lloyd Harbor shall issue a permit to the Plaintiff-Petitioners, for the erection of a dock at their premises at 28 Plover Lane, Huntington, New York upon filing *any* required application, and the payment of any fee required."

154.    No appeal was taken.

**The defendants' continued bad faith obstructionism, in the wake of *Kleinknecht I***

155.    In or about August of 2014, the plaintiffs submitted a permit application for the construction of a combination fixed pier/dock, with a ramp coming to a floating dock.

156.    On August 12, 2014, the Village summarily denied the application.

157.    The Letter of Denial cited to Article XVII (Coastal District-1) (COD-1) of the Village Code provisions which required, among other things, that private docks shall be of floating type variety only [Village Zoning Code Section 205-104(B)(1)(a)], the dock shall not exceed 75 linear feet seaward from the mean high water line [Section 205-104(B)(1)(b)], and that the seaward end of the dock shall not extend beyond the point where mean low water depth at such point exceeds 2 feet [Section 205-104(B)(1)(c)]. Ex. 3.

158.    The Letter of Denial directed the plaintiffs to apply to the ZBA to seek relief from the cited sections of the COD-1 ordinance. *Id*.

159.    The plaintiffs submitted their application to the ZBA seeking to construct the dock in variance of local COD-1 regulations.

160.    Along with the application, the plaintiffs submitted the approval and permit letters of both the DEC and the Army Corps.

161.    Plaintiffs' application came on to be heard by the ZBA on December 11, 2014.

162.    At the conclusion of the hearing, the ZBA voted to deny the application by a 3 to 0 vote with two members abstaining.

163.    On March 4, 2015, the ZBA filed its written Decision denying the variance.

164.    The ZBA Decision *first* held that the plaintiffs "do not own any development rights over that portion of their property on which they propose to construct a dock" and therefore the Planning Board did not have jurisdiction to consider the application.

165.    The ZBA Decision *next, alternatively*, also went through the factors required by the Local Waterfront Revitalization Program ("LWRP") adopted by local ordinances and determined that the application did not meet the standards of the Village.

166.    The ZBA Decision was a pre-determined *fait accompli*.

167.    The Village and the ZBA never had any intention of complying with the *Kleinknecht I* order and judgment directing the Village to issue a permit for the construction of a dock.

168.    The Village and the ZBA never had any intention of reviewing the competing regulations of the DEC, the DOS, and the Army Corps, or any intention of informing itself of the true nature of the application.

169.    While the Appellate Division in *Kleinknecht II* determined that the second (alternative) ground for denial of the plaintiffs' variance application was supported by enough evidence to come within the wide ambit of discretion traditionally afforded to ZBAs, it did so only while ***simultaneously*** determining, in *Kleinknecht III,* that the plaintiffs are entitled to a permit without any variance.

170.    Had *Kleinknecht III* not been handed down ***simultaneously***, thus effectively mooting *Kleinknecht II*, the Appellate Division would have been required to address the ZBA's manifest bad faith, and the fact that its purported exercise of discretion had been pretextual, in furtherance of a pre-determined outcome.

171.    There may have been enough evidence to justify an independent and neutral ZBA in denying the variance had the ZBA been proceeding in good faith.  But this was not an independent and neutral ZBA.

172.    The bad faith is made manifest by the ZBA's primary stated basis for its determination: The continued viability of the open space easement.

173.    The ZBA Decision announced as its primary stated basis for denying the plaintiffs' application that it lacked jurisdiction because of the open space easement.

174.    The open space easement was the precise issue before Justice Adams in *Kleinknecht I.*

175.    The *Kleinknecht I* Judgment unequivocally directed that the Village "shall" issue a permit to the plaintiffs to construct a dock.

176.    By reason of the foregoing, the ZBA primary determination that it lacked jurisdiction to hear the application due to the continued effectiveness of the open space easement was so directly contemptuous of Justice Adams as to unmask the second, alternative basis of the ZBA decision as having been pretextual, and pre-determined, without consideration of the merits.

### The intensification of the defendants' bad faith obstructionism

177.    On or about April 26, 2016, without waiting for a resolution to *Kleinknecht II*, the plaintiffs submitted a revised permit application for the construction of a 75-foot floating dock (the "Amended Application").   The Amended Application conformed with all applicable zoning regulations and did not require any variances.

178.    Pursuant to § 205-33 of Article VIII of the Village Zoning Code, the Building Inspector was required to make a referral to the Site and Building Permit Review Board of the Village within 21 days of receipt of the application.

179.    Upon receipt of the Building Inspector's referral, the Site and Building Permit Review Board "shall review and approve, with or without conditions, or it shall disapprove any building permit referred to it pursuant to § 205-33. *Id.* § 205-34.

33

180.    Notwithstanding the foregoing, the Building Inspector did not issue a permit, nor did he make a referral to the Site and Building Permit Review Board or issue any other decision on the Petitioners' Amended Application.

181.    Rather, the Building Inspector referred the application to John Ritter, Jr., the Village Attorney, for a response.

182.    By letter dated May 31, 2016, the Village Attorney advised that the plaintiffs' application would not even be considered, due to the open space easement.

183.    According to the Village Attorney, "the Building Inspector is not authorized to issue any building permits for the encumbered portion of the Kleinknecht property."

184.    The Building Inspector, pursuant to Mr. Ritter's instruction, failed and refused to take any action.

185.    The Building Inspector's failure to issue a permit as required by the Village Code was done with the knowing, willful, and intentional purpose of effecting a denial of the plaintiffs' right to a dock, and thus continuing to deprive the plaintiffs of this valuable property interest.

186.    In *Kleinknecht III*, that refusal was adjudicated to be arbitrary, capricious, and unlawful, by Judge Palmieri, and then by the Appellate Division.

187.    Thereafter followed the additional actions, continuing to this day, described in ¶¶ 26-39, *supra*.

## First Claim

188.    The individual and entity defendants have, in violation of 42 U.S.C. §1983, knowingly and willfully taken from the plaintiffs, under color of governmental authority, without compensation, in violation of the "takings" clause of the Fifth Amendment of the Unites States Constitution, as made applicable to the states by the Fourteenth Amendment due process clause of

34

the United States Constitution, the plaintiffs' property right to construct a permitted dock off the Subject Property, and so have substantially diminished the value of the Subject Property, beginning with the 2011 date of the plaintiffs' first application to construct a dock, and continuing to date, and caused the plaintiffs to incur the costs of litigation in the state courts and now this federal court.

189.  The plaintiffs are entitled to compensatory damages, injunctive and declaratory relief, and attorneys' and expert fees pursuant to 42 U.S.C. §1988.

<h3 style="text-align:center">Jury trial demanded</h3>

190.  The plaintiffs demand a jury trial.

<h3 style="text-align:center">Prayer for relief</h3>

WHEREFORE, plaintiffs request declaratory and injunctive relief directing the defendants to take all action necessary to enable the plaintiffs to construct a dock off of the Subject Property; and demand a money judgment against defendants, jointly and severally, on each its claim, in the sum to be established at trial but believed to be not less than $2,000,000, together with interest thereon; together with attorney's fees, expert fees, and costs, disbursements, and punitive damages, in an amount determined by the Court to be just and proper; and such other and further relief as this Court deems just and proper in the circumstances.

Dated: Mineola, New York
October 11, 2019

LYNN GARTNER DUNNE, LLP
*Attorneys for Plaintiffs*

By: _____
Robert P. Lynn, Jr. (RL 1737)

330 Old Country Road, Suite 103
Mineola, New York 11501
(516) 742-6200
rplynn@lgdlaw.com

35